PATRICIA RIVET MURRAY, Judge.
| plaintiffs, who represent the minor children of decedent Robert Irwin, appeal the trial court’s granting of summary judg *953 ment dismissing with prejudice their claims against defendant Ray Manning. For the reasons that follow, we affirm.
FACTS AND PROCEEDING BELOW
On June 26, 2009, plaintiffs filed a Petition for Survivorship and Wrongful Death against two defendants, Peter Rubens and Ray Manning. In the petition they alleged that Peter Rubens had shot and killed Robert Irwin while Rubens was in the course and scope of his employment by Ray Manning. Manning filed a motion for summary judgment asserting that, as a matter of law, he owed no duty to Irwin and therefore could not have been guilty of any negligence that contributed to Irwin’s death. Specifically, Manning averred that plaintiffs could not prove that he was the employer of Peter Rubens, who was an independent contractor. Manning submitted deposition testimony to show that Rubens was working on post-Katrina rebuilding projects at several houses in addition to Manning’s house, which was located at 5086 S. Prieur Street. Manning was not living in the S. Prieur house at |2the time, which had been flooded during Hurricane Katrina. However, Manning had given Rubens and his girlfriend permission to live temporarily on the second floor of the S. Prieur house. It is undisputed that the shooting occurred on a Sunday afternoon, June 29, 2008, when Irwin, who was the foreman on Rubens’ construction jobs, went to see Rubens at the S. Prieur house where Rubens was residing.[1]
The trial court heard the motion on November 19, 2010 and granted it from the bench. On November 29, 2010, the trial court rendered a written judgment without written reasons granting Manning’s motion for summary judgment and dismissing plaintiffs claims against him with prejudice. Plaintiffs now appeal that judgment.
ISSUE
The sole issue on appeal is whether the trial court erred by granting summary judgment finding that plaintiffs, as a matter of law, will not be able to prove that Ray Manning breached any duty he owed to Robert Irwin or that such a breach contributed to Irwin’s death.
STANDARD OF REVIEW
The granting of summary judgment by a district court is reviewed de novo, with the appellate court using the same criteria that governed the district court’s consideration of whether summary judgment is appropriate. Safeway Insurance Co. of La. v. Premier Automotive Superstore, 09-0074, p. 2 (La.App. 4 Cir. 5/27/09), 13 So.3d 236, 238. Summary judgment shall be rendered if there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966 C(l). When, as in the instant case, the party bringing the motion is not the party that will bear the burden of proof at trial, “the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.” La. C.C.P. art. 966 C(2).
*954 DISCUSSION
In their petition, their opposition to the motion for summary judgment, and their brief to this Court, plaintiffs argue that Ray Manning is liable for the death of Robert Irwin because: (1) Manning negligently failed to warn Irwin that Rubens was dangerous and carried a gun, and/or negligently failed to dismiss Rubens upon learning that he was carrying a gun at the workplace; (2) Manning negligently failed to do a proper background check on Rubens before hiring him; and/or (3) Manning was the employer of Rubens and is vicariously liable for the acts of Rubens while in the course and scope of his employment. It is undisputable that, to prevail in this action based upon negligence, the plaintiffs must prove that Ray ^Manning owed Robert Irwin a duty, which Manning breached, causing Irwin’s death. See Hackett v. Schmidt, 630 So.2d 1324, 1327 (La.App. 4th Cir.1993).
In his motion for summary judgment, Manning argued that no such duty existed under the facts of this case. Additionally, he argued that plaintiffs had failed to put forth any evidence that Rubens was Manning’s employee, as opposed to an independent contractor, or alternatively, that the shooting had occurred within the course and scope of such employment. In support of his motion, Manning submitted his own deposition testimony and that of two others: plaintiff Kendra Lee, who is the mother of two of Irwin’s children, and Dr. Nicholas Vergara, the owner of one of the houses that Rubens was working during the same time period he was working on Manning’s house. Relying on the same three depositions, the plaintiffs opposed the motion arguing that there is a genuine issue of fact as to whether Rubens was Manning’s employee.
In his deposition, Manning testified that he had met Rubens twelve to fifteen years before at a Mardi Gras event, and after that he generally saw Rubens once or twice a year at the same event or sometimes on Mardi Gras day. Sometime after Manning’s home was ruined by Hurricane Katrina, while Manning was in the process of repairing it, Rubens approached Manning and suggested that he could finish renovating the house for Manning. Rubens said he was working on other houses in the vicinity. Rubens came out to see the S. Prieur house, and Manning agreed to let him do the job. They discussed the approach and agreed on a cost estimate. They did not sign a written contract. The bottom floor of the house was |figutted, but there was a bedroom with a bed and a functioning bathroom on the second floor. Manning told Rubens that he and his girlfriend could live on the second floor while Rubens was doing the work, and a week later they moved in. Rubens procured all the workers for the job, such as getting his brother-in-law from Florida to do plumbing and electrical work. Manning met with Rubens once a week and issued all the checks for materials and payment to the workers. A few days before the shooting occurred, Manning heard that Rubens was getting a crew together to go to Iowa where Rubens supposedly had obtained a more lucrative contract to do work necessitated by the flooding that had occurred there in the spring of 2008. Manning was not happy when he checked on his house on a Thursday evening and discovered that Rubens was allowing the workers he was recruiting for his Iowa crew to sleep there, but because of the way the job had been going, Manning figured it might be best if Rubens did leave. Manning was at a friend’s house around the corner from the S. Prieur house on Sunday afternoon about 5:30, when he learned of the shooting.
In his deposition, Dr. Nicholas Vergara testified that he had purchased his house *955 on Maple Street in April, 2008, and was interested in adding a mother-in-law apartment. His accountants told him that Richard Rubens was a good contractor who had a large crew of workers. Dr. Vergara went to see Rubens in May, 2008, at a house Rubens was renovating in Metairie. He observed Rubens directing a crew of about fifteen workers. Rubens introduced Vergara to his foreman, Mr. Irwin, and to his other foreman, who spoke Spanish. Vergara was told that Irwin’s |r,nickname was “Bee,” because Irwin was a hard worker. Rubens then offered to show Vergara some of his other construction projects, including Manning’s house. When Vergara went to Manning’s house the next day, he was impressed with the work. Rubens said he was also living in Manning’s house. They then had a conversation in which Vergara mentioned that he did Karate, and Rubens responded by pulling a small silver gun out of his back pocket and telling Vergara that he carried the gun as a means of protecting himself from trouble with his workers or with the cops. Vergara agreed to let Rubens work on his house, which Rubens began in mid-June using a twenty-person crew. At some point, Vergara became dissatisfied with Rubens, who was showing up late in the afternoon smelling of alcohol. Vergara spoke to Rubens on several occasions about his concerns, including Rubens having lied about being a licensed contractor. Vergara said Rubens became angry and threatening during these confrontations, but Vergara was afraid to outright fire Rubens because he was aware that Rubens carried a gun. Vergara testified that regardless of what was happening between him and Rubens, Irwin kept showing up for work and doing a good job. Vergara stated that on Saturday, June 28, Irwin called him on the phone; Irwin said he was sorry about the problems, that he would talk to Rubens and that he, Irwin, would come to Vergara’s house on Monday and finish the job alone. Vergara testified that he warned Irwin to be careful because Rubens had a gun, but Irwin said he knew how to take care of himself. Irwin did not show up at Vergara’s house on Monday, and on Tuesday Vergara learned that Rubens had shot and killed Irwin.
|7In her deposition Kendra Lee testified that prior to his death, Irwin was working as the “lead man” for Richard Rubens, who was doing construction work on several houses in the general area of S. Prieur Street. There were a lot of other people, most of whom Ms. Lee believed to be illegal aliens, who were also working for Rubens along with Irwin. Irwin had been working for Rubens since January or February of 2008. About three weeks before Irwin died, Ms. Lee had a conversation with him in which he told her he wanted to leave Rubens because Rubens was “going crazy” on him. Irwin told her that Rubens carried guns around, that he had witnessed Rubens being mentally and physically “mean” to his girlfriend, and that one of the homeowners had mentioned that he would rather have Irwin finish his house without Rubens. Ms. Lee testified that she believed on the Sunday he was shot, Irwin had gone to see Rubens in order to quit and ask for his last paycheck.
Under Louisiana law, there is no duty to protect against the acts of a third party unless the defendant has a “special relationship” with the victim. Hackett, supra at 1328. In Hackett, this court affirmed a summary judgment granted on the basis that the mere presence of a child in the defendant’s home, where the child was visiting with her parents, did not give rise to a duty on the part of the defendant to warn the child’s parents or to otherwise protect the child from being sexually molested by the defendant’s husband. Id. In that case, this Court also rejected the *956 plaintiffs’ argument that the situation was analogous to a “premises liability” case, stating:
|sThe Hacketts argued that Mrs. Schmidt should be liable for failing to warn about or prevent the abuse in the same way that she would liable for failing to warn about or prevent an injury caused by the existence of a hole in the floor of her home or the presence of a dog on the premises. However, this situation cannot be likened to a premises liability situation, where the owners of the property may be strictly liable for injuries caused by defects in their property. Mr. Schmidt is not Mrs. Schmidt’s property. As the Hacketts concede, Mrs. Schmidt cannot be held responsible for Mr. Schmidt’s negligent or intentional acts. Neither can she be held responsible for failing to warn about or protect from his activities in a situation where she has no special relationship to the victim.
Id., pp. 1828-29.
In the instant case, we find that there is no evidence of any special relationship between Ray Manning and Robert Irving that would impose a duty upon Manning to protect Irving from being shot and killed by Rubens in Manning’s home. The plaintiffs have not put forth any evidence of circumstances that would give rise to a duty on the part of Manning to warn Irving that Rubens was dangerous; nor have they cited any law that would impose upon Manning either a duty to warn or a duty to perform a background check on Rubens. Moreover, even if a duty to warn existed, Manning’s failure to do so would have been rendered meaningless by the deposition testimony showing that Irving was aware that Rubens carried a gun and had been specifically warned by Dr. Vergara to be careful when dealing with Rubens.
Based on the deposition testimony submitted, we also find no evidence indicating that Manning could be found vicariously liable as Rubens’ employer for Rubens’ killing of Irving. First, the plaintiffs have not submitted evidence sufficient to pose a genuine issue of fact as to whether Rubens was Manning’s employee, rather than an independent contractor. The deposition testimony indicates that Rubens was overseeing construction jobs for other homeowners at the same time he was doing Manning’s house, and that Rubens selected, hired and | ^directed his own crew. Regarding the determination of whether someone is an employee or an independent contractor, this court has stated:
The issue of independent contractor status is a proper subject to be resolved on summary judgment. Likewise, the issue of master-servant relationship is properly a subject for summary judgment. Where a master-servant relationship exists the master is answerable for the tortious acts of his servants. C.C. Art. 176, 2317, 2320. In determining whether such a relationship exists the major consideration is the control or right of control which one party exercises over the other. Savoie v. Fireman [Fireman’s] Fund Ins. Co., 347 So.2d 188 (La.1977); Donovan v. Standard Oil Co., 197 So. 320 (La.App. 2nd Cir.1940). Accordingly, courts may examine the economic relationship of the parties and the right of one party to control the time and physical activities of the other party. Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (La.1968); Badeaux v. East Jefferson General Hospital, 364 So.2d 1348 (La.App. 4th Cir.1978); Florence v. Clinique Laboratories, Inc., 347 So.2d 1232, 1237 (La.App. 1st Cir.1977).
Butler v. Atwood, 420 So.2d 742, 745 (La.App. 4th Cir.1982) (Emphasis added).
*957 The plaintiffs presented no evidence that indicated that Manning had the right to control the time or activities of Rubens, who was working on several houses for several homeowners during the same time period. Even assuming the plaintiffs had presented evidence sufficient to create a factual issue as to whether Manning was Rubens’ employer, however, to preclude summary judgment they would also have to submit similar evidence indicating that the shooting of Irving was within the course and scope of Rubens’ employment.
In Baumeister v. Plunkett, 95-2270 (La.5/21/96), 673 So.2d 994, the Louisiana Supreme Court stated:
The law in this area is clear that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224, 226. The course of employment test refers to time and place. Benoit v. Capitol Manufacturing Co., 617 So.2d 477, 479 (La.1993). The scope of employment test examines the employment-related risk of injury. Id.
⅜: ⅜ ⅜ ⅜ ⅜
1 m“An employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours.” Scott v. Commercial Union Ins. Co., 415 So.2d 327, 329 (La.App. 2d Cir.1982) (citing Bradley v. Humble Oil & Refining Co., 163 So.2d 180 (La.App. 4th Cir.1964)). “Vicarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer’s objective.” Id.
More specifically, our LeBrane v. Lewis decision considered the following factors in holding an employer liable for a supervisor’s actions in stabbing his fellow employee:
(1) whether the tortious act was primarily employment rooted;
(2) whether the violence was reasonably incidental to the performance of the employee’s duties;
(3) whether the act occurred on the employer’s premises; and
(4) whether it occurred during the hours of employment.
292 So.2d at 218.
Baumeister, 95-2270, pp. 3-4, 673 So.2d at 996-997. In Baumeister, the Court held that a hospital was not vicariously liable for the actions of its employee, a nursing supervisor, who sexually assaulted another employee in the nurses’ lounge while both were working a night shift.
In the instant case, the plaintiffs rely upon the earlier Supreme Court decision, LeBrane v. Lewis, 292 So.2d 216 (La.1974), cited with approval in Baumeister, as providing authority to preclude summary judgment in favor of Manning. In Le-Brane, the plaintiff, a kitchen helper, got into a dispute with his supervisor and refused to leave the premises when ordered to do so. The supervisor, who had the requisite authority, then fired the helper, and on their way out of the building, the supervisor stabbed the helper. Finding that the employer was liable for the injury to the kitchen helper, the Supreme Court noted that the incident occurred “on the employment premises and during the hours of|nemployment,” and that the fight was reasonably incidental to the performance of the supervisor’s duties of firing the disobedient employee and removing him from the business premises. Thus, the Court found that the supervisor was acting at least partially for the benefit of his employer by firing and removing the plaintiff/employee. See LeBrane, 292 So.2d at *958 217-219; Baumeister, 95-2270, pp. 4-5, 673 So.2d at 997.
We reject the plaintiffs’ argument because we find the facts of the instant case to be completely distinguishable from those of Lebrane. There is no evidence that any work was being done on Manning’s house at the time of the shooting; in fact, it was a Sunday, and therefore did not occur during normal working hours. Moreover, Irving did not go to his workplace to see Rubens; he went to Manning’s house because it was Rubens’ residence at the time. In addition, although one of the plaintiffs, Kendra Lee, testified that she believed Irving was going to see Rubens in order to quit, the testimony of Dr. Vergara suggests that Irving was going to tell Rubens that Vergara wanted Irving alone to finish his job. At the hearing on the motion, the trial court noted that the testimony at best indicates that Irving was going to quit working for Rubens on the Vergara job, which had nothing to do with the defendant, Manning. Confronted by this testimony, the plaintiffs failed to introduce any evidence showing what actually occurred between Irving and Rubens just prior to the shooting. Without such evidence, plaintiffs cannot demonstrate that they will be able to prove that Rubens’ shooting of Irwin was in the course and scope of Rubens’ employment by Manning, even assuming he was Manning’s employee.
We therefore find that the summary judgment dismissing the plaintiffs’ case against Ray Manning was properly granted.
1 ^CONCLUSION
Accordingly, for the reasons stated, we affirm the judgment of the trial court.
AFFIRMED

. Although the criminal case against Rubens is neither pertinent to this appeal nor a part of this record, the parties aver, and the hearing transcript reflects, that Rubens was tried and convicted in criminal district court for murdering Irwin, for which Rubens is currently incarcerated.